*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DOROTHY M. FEIGLEY, Trustee of the
DOROTHY M. FEIGLEY-BACZYNSKI FAMILY
TRUST DATED JANUARY 26, 1995,

UNPUBLISHED
December 7, 2023

        Plaintiff/Counterdefendant-Appellant,

v

JENNIFER BARR, Trustee of the HOWARD E.
PALMER REVOCABLE TRUST AGREEMENT
DATED JANUARY 18, 1993,

No. 363621
Oakland Circuit Court
LC No. 2019-176954-CH

        Defendant/Counterplaintiff/Third-
        Party Plaintiff-Appellee,

and

DOROTHY M. FEIGLEY,

        Third-Party Defendant-Appellant.

Before: CAVANAGH, P.J., and RIORDAN and PATEL, JJ.

PER CURIAM.

Plaintiff/counterdefendant, Dorothy M. Feigley, as trustee of the Dorothy M. Feigley-Baczynski Family Trust Dated January 26, 1995 (the Feigley Trust), and defendant/counterplaintiff/third-party plaintiff, Jennifer Barr, as trustee of the Howard E. Palmer Revocable Trust Agreement Dated January 18, 1993 (the Palmer Trust) own neighboring properties in a residential area of Milford. This boundary dispute concerns two parcels of property that have no legal description, but the parties have identified them as Area 1 and Area 2. For approximately 30 years, third-party defendant, Dorothy M. Feigley, was under the mistaken belief that Areas 1 and 2 were part of the Feigley Trust's property based on her conversations with two former neighbors. The Feigley Trust alleged claims of adverse possession and prescriptive easement, contending that it maintained actual, visible, open, notorious, exclusive, continuous, and uninterrupted possession of the two subject parcels of land that was hostile and under cover of a claim of right for more than 15 years. On cross-motions for summary disposition, the trial court

determined that the Feigley Trust "failed to establish the necessary elements of hostility and/or adverse possession and/or acquiescence." Because the evidence and testimony reflect that the Feigley Trust adhered to boundaries it attempted, but failed, to mark as true boundary lines, we find that the Feigley Trust did not establish the required element of hostility for adverse possession and prescriptive easement. Further, the Feigley Trust failed to establish that both parties had treated a particular boundary as the true boundary line for either of the disputed parcels and thus we find that the trial court did not err by holding that the Feigley Trust was unable to establish a claim for acquiescence. Accordingly, we affirm.

## I. BACKGROUND

Feigley has lived at the property commonly known as 177 Dansin Drive in Milford, Michigan (the Feigley property) since 1991. The Feigley property was previously part of a larger parcel of land that was owned by Feigley's brother and then, following his death in 1980, Feigley's parents. Feigley's parents hired a neighbor and local surveyor, Mr. Kostick, to survey and divide the larger parcel into four pieces of property. One of the four parcels was transferred to Feigley, and the other three were transferred to her sisters.[1]

Before purchasing the property,[2] Feigley spoke with two neighbors who allegedly pointed out the property line. Mr. Koss lived two addresses to the west of the Feigley property and his property abutted the Feigley property "at a certain point." Feigley contends that Mr. Koss told her that "the property goes right along through here" as he motioned where the property line was on the other side of the Feigley driveway. Similarly, Mr. Kostick, who lived two streets behind Feigley and conducted the survey for her parents, motioned where the property line was and told her "the property line goes right through here." Feigley planted trees "right along that line thinking, okay, that's right close to what they had said was the line, that's right on the line, so that would be a good marker of these trees." Feigley admitted that, other than her conversations with the two neighbors,[3] there was nothing else that she based the property line on. Feigley did not have the property surveyed when she purchased it, and did not recall looking at a survey before the purchase.

In 1996, the Palmer Trust acquired the property commonly known as 975 General Motors Road, Milford, Michigan (the Palmer property). The Palmer property is north of and adjoining the Feigley property.

For approximately 30 years, Feigley was under the mistaken belief that Areas 1 and 2 were part of the Feigley property based on her conversations with Mr. Kostick and Mr. Koss. The

---

[1] The three parcels owned by Feigley's sisters are to the south and to the west of the Feigley property.

[2] Feigley initially owned the parcel with her ex-husband. The Feigley property was awarded to her in the divorce judgment. Thereafter, Feigley conveyed her interest in the Feigley property to the Feigley Trust.

[3] Mr. Koss and Mr. Kostick are both deceased.

disputed parcels do not have a legal description. And Feigley admits that Areas 1 and 2 are not included in the legal description on the recorded deed for the Feigley property.

Area 1 is north of the Feigley property. According to a survey that was conducted for Feigley during this litigation, Area 1 (highlighted) is 115.34 feet x 32.21 feet x 113.79 feet x 52.43 feet, totaling 4,815 square feet or 0.11 acres:[4]



In 1990, Feigley had a 500-gallon propane tank placed on Area 1, and a service line was buried under Area 1. The propane tank provides fuel for cooking, heating, and hot water for the home on the Feigley property. Although the tank has been replaced, there has been a propane tank in the same location for the duration of time that Feigley has lived on the property. In addition to the propane tank, Feigley planted white pine trees on Area 1 in 1990 and has nurtured the trees

---

[4] The Feigley property is parcel no. 16-15-101-014 to the south of Area 1. The Palmer property is parcel no. 16-10-351-014 to the north of Area 1.

since they were planted. Part of Area 1 is wooded, and part of it is grass. Feigley has mowed the grass in Area 1 since she has owned the property. And she tends to flowers in the area. Feigley also has sawhorses and other building materials stored on Area 1. Area 1 is not fenced in, but there is a fence to the north of it that is owned by her neighbors, the Charters.[5] Anyone can access Area 1.

Area 2 is adjacent to and east of Area 1. It includes a chain-link fence that Feigley installed around her backyard in 1999 to contain her dogs.[6] Feigley contends that the fence was put on the Feigley property. She testified that she mowed trails around the Feigley property for 30 years and the fence was installed within the mowed trail and within the property boundary that Mr. Koss and Mr. Kostick pointed out. According to a survey that was conducted for Feigley during this litigation, Area 2 (highlighted) is 106.82 feet x 106.93 feet x 20.31 feet, totaling 1,080 square feet or 0.02 acres:



---

[5] The Charters installed their fence after Feigley purchased the Feigley property.

[6] The chain-link fence is depicted by the broken lines in the survey.

In 2019, the Palmer Trust retained Nowry & Hale Land Surveying LLC to conduct a land survey of the Palmer property. According to the survey, the Feigley Trust's chain link fence extends 19.81 feet over a distance of 110.4 feet onto the southern portion of the Palmer property, and an asphalt parking pad encroaches 12 to 16 inches on the Palmer property. In June 2019, a representative of the Palmer Trust provided Feigley with a copy of the survey and a letter directing her to correct the encroachments.

In August 2019, workers were clearing underbrush in heavily wooded areas of the Palmer property when Feigley allegedly "trespassed onto the Palmer Property yelling and screaming at the employees and forcing them to halt work." Feigley admitted that she approached the workers and talked to them because they were "getting close" to her property and she did not want any damage to her property. The Palmer Trust maintains that the workers were not on the Feigley property at any time.

In September 2019, the Feigley Trust commenced this action asserting claims for adverse possession or, alternatively, prescriptive easement.[7] The Palmer Trust denied the allegations, and asserted that the Feigley Trust did not possess or have any legal right to use any portion of the Palmer property. The Palmer Trust filed a counterclaim against the Feigley Trust and a third-party complaint against Feigley alleging claims for quiet title, trespass, and nuisance in fact.

Following discovery, the Palmer Trust filed a motion for summary disposition pursuant to MCR 2.116(C)(8) and (C)(10). Relevant to this appeal, the Palmer Trust argued that the Feigley Trust could not establish the hostility element of adverse possession or prescriptive easement because it was simply trying to hold what it believed to be the true property line. The Feigley Trust argued that it was entitled to summary disposition as a matter of law pursuant to MCR 2.116(I)(2), and requested leave to amend its complaint to add a claim for acquiescence in the event that the court concluded that it could not establish a claim for adverse possession.

The trial court granted the Palmer Trust's motion for summary disposition pursuant to MCR 2.116(8) and (10), and denied the Feigley Trust's motion for summary disposition pursuant to MCR 2.116(I)(2), concluding:

> The Court finds that Defendant is entitled to summary disposition for the reasons set forth by Defendant. The evidence submitted clearly shows that Plaintiff has failed to establish the necessary elements of hostility and/or adverse possession and/or acquiescence.

Because the trial court determined that the Feigley Trust had no interest or easement on the Palmer property, the Palmer Trust moved for summary disposition under MCR 2.116(8) and (10) on its counterclaims and third-party claims. The Palmer Trust also sought an order compelling Feigley to remove the propane tank and chain-link fence from the Palmer Trust's property, awarding $10,000 in damages, and awarding costs and attorney's fees incurred by the Palmer Trust. The Feigley Trust did not dispute that the Palmer Trust was entitled to summary disposition

---

[7] In November 2019, the Feigley Trust filed a first amended complaint to include Jennifer Barr as the trustee of the Palmer Trust as defendant, but the allegations and claims remained the same.

on its counterclaims and third-party claims, but maintained that there was no factual or legal support the Palmer Trust's damage claims and there was no legal basis to support a claim for attorney's fees. Feigley further contended that she should not be compelled to remove the fence and the propane tank before exhausting all appellate rights.

The trial court granted summary disposition to the Palmer Trust under MCR 2.116(C)(10) on all counts of the counterclaim and third-party claim, but denied its request for damages, attorney's fees, and sanctions. The court further ordered Feigley to remove the propane tank and fence from the Palmer property.[8] This appeal followed.

## II. STANDARD OF REVIEW

"We review de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "Where a motion for summary disposition is brought under both MCR 2.116(C)(8) and (C)(10), but the parties and the trial court relied on matters outside the pleadings, as is the case here, MCR 2.116(C)(10) is the appropriate basis for review." *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 457; 750 NW2d 615 (2008). When reviewing a motion for summary disposition under MCR 2.116(C)(10), a trial court must consider the evidence submitted by the parties in the light most favorable to the non-moving party and may only grant the motion if there is no genuine issue of material fact. *El-Khalil*, 504 Mich at 160. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (cleaned up). But "[t]he court is not permitted to assess credibility, or to determine facts" in analyzing whether a genuine issue of material fact exists. *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994).

## III. ADVERSE POSSESSION AND PRESCRIPTIVE EASEMENT

The Feigley Trust argues that the trial court erred by granting the Palmer Trust's motion for summary disposition and denying the Feigley Trust's countermotion for summary disposition because there was no genuine issues of material fact that the Feigley Trust maintained actual, visible, open, notorious, exclusive, continuous, and uninterrupted possession of the two subject parcels of land for the statutory period of 15 years that was hostile and under cover of a claim of right to establish a claim of adverse possession. We disagree.

The statutory basis for a claim of adverse possession arises under MCL 600.5801:

No person may bring or maintain any action for the recovery or possession of any lands or make any entry upon any lands unless, after the claim or right to make the entry first accrued to himself or to someone through whom he claims, he commences the action or makes the entry within the periods of time prescribed by this section.

---

[8] This Court granted a stay of proceedings pending resolution of this appeal. *Dorothy M Feigley-Baczynski Trust v Howard Palmer Revocable Trust*, unpublished order of the Court of Appeals, entered December 12, 2022 (Docket No. 363621).

"Generally, an action for the recovery or possession of land must be brought within 15 years after it accrues." *Wengel v Wengel*, 270 Mich App 86, 92; 714 NW2d 371 (2006), citing MCL 600.5801(4). A successful adverse possession claim requires proof of the following:

> A claim of adverse possession requires clear and cogent proof that possession has been actual, visible, open, notorious, exclusive, continuous, and uninterrupted for the statutory period of fifteen years. These are not arbitrary requirements, but the logical consequence of someone claiming by adverse possession having the burden of proving that the statute of limitations has expired. To claim by adverse possession, one must show that the property owner of record has had a cause of action for recovery of the land for more than the statutory period. [*Kipka v Fountain*, 198 Mich App 435, 439; 499 NW2d 363 (1993) (citation omitted).]

The clear and cogent evidence standard is "more than a preponderance of the evidence, approaching the level of proof beyond a reasonable doubt." *Walters v Snyder*, 225 Mich App 219, 223; 570 NW2d 301 (1997). "The evidence offered in support of adverse possession must be strictly construed with every presumption being exercised in favor of the record owner of the land." *Rozmarek v Plamondon*, 419 Mich 287, 292; 351 NW2d 558 (1984).

"When the elements of adverse possession have been met, the law presumes that the true owner, by his acquiescence, has granted the land, or interest to the land, so held adversely." *Marlette Auto Wash, LLC v Van Dyke SC Props, LLC*, 501 Mich 192, 202; 912 NW2d 161 (2018) (cleaned up). "[T]o make good a claim of title by adverse holding the true owner must have actual knowledge of the hostile claim, or the posession [sic] must be so open, visible and notorious as to raise the presumption of notice to the world that the right of the true owner is invaded intentionally and with a purpose to assert a claim of title adversely to his, or so patent that the owner could not be deceived, and such that if he remains in ignorance it is his own fault . . . ." *Doctor v Turner*, 251 Mich 175, 186; 231 NW 115 (1930) (citations omitted). "A mere permissive possession or one consistent with the title of another can never ripen into a title by adverse possession." *Burns v Foster*, 348 Mich 8, 15; 81 NW2d 386 (1957).

In this case, the trial court concluded that plaintiff failed to establish the hostility element. "The term 'hostile' as employed in the law of adverse possession is a term of art and does not imply ill will; rather, hostile use is that which is inconsistent with the right of the owner, without permission asked or given, and which would entitle the owner to a cause of action against the intruder." *Houston v Mint Group, LLC*, 335 Mich App 545, 559; 968 NW2d 9 (2021) (cleaned up). This Court has explained the nuances of the hostility element:

> Where a landowner possesses the land of an adjacent owner with the intent to hold to the true line, the possession is not hostile and cannot establish adverse possession. By contrast, where a person possesses the land of another intending to hold to a particular recognizable boundary regardless of the true boundary line, the possession is hostile and adverse possession may be established. Simply being mistaken with regard to the true boundary line, however, does not defeat a claim of adverse possession. As noted by this Court in *DeGroot* [*v Barber*, 198 Mich App 48, 53; 497 NW2d 530 (1993)], it would be unjust to limit the application of the doctrine of adverse possession to those adverse possessors who knew the

possession was wrong, while excluding those whose possession was by mistake, thereby rewarding the thief while punishing the person who was merely mistaken. [*Gorte v Dep't of Transp*, 202 Mich App 161, 170; 507 NW2d 797 (1993) (citations omitted).]

"To phrase this slightly differently, the difference is between erroneously placing a monument, intending to place it on the true line, but failing to do so, and erroneously believing a preexisting monument (either artificial or natural) represents the boundary, and holding to that monument." *DeGroot*, 198 Mich App at 52 n1. The hostility element cannot be satisfied in the former situation, but hostility exists in the latter circumstances. *Id*. at 52. "A party seeking to prove hostility need only demonstrate an intent to hold to a visible, preexisting, and recognizable boundary, and if there is evidence that the party did not believe that the boundary was the true line, it would make his or her case stronger because it would reflect true hostility." *Houston*, 335 Mich App at 563.

The *DeGroot* panel explained the two distinctions:

[I]n *Warner*[ *v Noble*, 286 Mich 654; 282 NW 855 (1938)], the parties missighted along survey stakes in locating the boundary line before the building of a cottage, which proved to encroach on the neighboring lot. The Court concluded that there was no adverse possession inasmuch as the parties intended to hold to the true line. That is to say, they failed to respect the true line while attempting to do so and, therefore, there could be no adverse possession. An example of the second principle enunciated above, that adverse possession is established where the intent is to claim title to a visible, recognizable boundary, is illustrated in *Connelly* [*v Buckingham*, 136 Mich App 462; 357 NW2d 70 (1984)]. In *Connelly*, the defendants claimed ownership of property to a fence line, apparently under the mistaken belief that the fence accurately depicted the boundary between their property and the plaintiff's property. In fact, approximately 627 square feet over which the plaintiff held title was located on the defendants' side of the fence. The trial court concluded that defendants had established title by adverse possession, and this Court affirmed. Thus, adverse possession by the defendants was established despite the fact that they were respecting the line believed to be the boundary, but that proved not to be the true line. [*DeGroot*, 198 Mich App at 52-53.]

In *DeGroot*, the plaintiffs were under the mistaken belief that a road marked the south boundary line of their property. *Id*. at 49. This belief was based on their real estate agent's erroneous representation when they purchased the property. *Id.* The testimony established that the "plaintiffs intended to hold both to the true line and to a visible, recognizable boundary [the road], believing that to be the true line." *Id*. at 51. This Court concluded that the plaintiffs' mistake regarding the true boundary line did not defeat their claim for adverse possession because "it would be contrary to fundamental justice and public policy to limit the application of the doctrine of adverse possession to those cases where the adverse possessor knew his possession was deliberately wrong, while excluding the adverse possessor whose possession was by mistake. That would serve to reward the thief and punish the innocent, but mistaken, citizen." *Id*. at 53. This Court found the plaintiffs claimed possession and ownership of the property up to the visible, recognizable road boundary and thus the elements of adverse possession were met. *Id*.

In *Houston*, this Court noted that the *DeGroot* panel "somewhat blended or intertwined the states of mind regarding 'intent' and 'belief,' " but the *Houston* panel made clear that the two "are not one and the same for purposes of analyzing a claim of adverse possession and the element of hostility." *Houston*, 335 Mich App at 563. The *Houston* panel explained, "Failure to show 'belief' one way or the other does not doom a claim of adverse possession so long as there existed an intent to hold to a visible, recognizable boundary. *DeGroot* simply stands for the proposition that a party who does believe that the boundary is the true line is as entitled to claim adverse possession as the party who does not have that belief." *Id.*

Conversely, in this case, Feigley was unable to describe a visible, preexisting, recognizable boundary for Area 1. There was not a fence, road, retaining wall or other preexisting physical monument that Feigley erroneously believed represented the true boundary. Rather, she mistakenly believed that a hypothetical line that was vaguely pointed out by two former neighbors represented the true boundary and she intended to hold to that line. Feigley admitted that, other than her conversations with the two former neighbors over 30 years ago, there was nothing else that she based the property line on. Feigley was unable to define Area 1 or provide a legal description of the parcel. She simply stated, "It's green, it's got grass and trees." Nor could she provide any specific dimensions of the parcel. When she was asked how it was determined where the property boundaries were for Area 1, Feigley responded, "I know where Mr. Koss and Mr. Kostick both pointed out to me where they told me the line was." Feigley was also unable to describe any boundary markers. She simply stated, "I know where I believe it to be and where I've always though it to be for over 30 years."

Feigley now claims on appeal that she treated the Charters' fence as the northern property line. But this is inconsistent with her testimony that she planted the white pine trees over 30 years ago on what she believed to be the northern boundary in Area 1, as pointed out by the former neighbors. Feigley also testified that the Charters installed the fence after she planted the trees. This is insufficient to establish the hostility element for adverse possession of Area 1. See *DeGroot*, 198 Mich App at 52 n1 (stating that the hostility element can be satisfied if a party erroneously believes that a *preexisting* monument—either artificial or natural—represents the boundary and holds to that monument).

Similarly, Feigley's placement of the fence around Area 2 under the mistaken belief that the fence was placed on the true boundary line is insufficient to establish the hostility element for adverse possession of Area 2. See *id*. ("[E]rroneously placing a monument, intending to place it on the true line, but failing to do so" does not satisfy the hostility element.).

Because we find that the Feigley Trust has failed to establish the necessary hostility element to maintain an adverse possession claim for Areas 1 and 2, it is unnecessary to address whether the Feigley Trust has established the other elements of adverse possession. Accordingly, we conclude that the trial court did not err by granting summary disposition to the Palmer Trust on the Feigley Trust's adverse possession claim. And because we find that the Feigley Trust has

failed to establish the hostility element, we conclude that the trial court did not err by granting summary disposition to the Palmer Trust on the Feigley Trust's prescriptive easement claim.[9]

## IV. ACQUIESCENCE

The Feigley Trust further argues that the trial court erred by finding that it could not establish an alternative claim for acquiescence as a matter of law. We disagree.[10]

"Under Michigan law, parties may acquiesce to a new property boundary line." *Houston*, 335 Mich App at 567. "The law of acquiescence is concerned with a specific application of the statute of limitations to cases of adjoining property owners who are mistaken about where the line between their property is." *Kipka*, 198 Mich App at 438. Generally, the statute of limitations for an action for the recovery or possession of land is 15 years after the cause of action first accrues. MCL 600.5801(4). "The three theories of acquiescence include: (1) acquiescence for the statutory period; (2) acquiescence following a dispute and agreement; and (3) acquiescence arising from intention to deed to a marked boundary." *Houston*, 335 Mich App at 567 (cleaned up). Under the first theory, "acquiescence is established when a preponderance of the evidence establishes that the parties treated a particular boundary line as the property line" for the 15-year statutory period. *Houston*, 335 Mich App at 567-568 (cleaned up). "Our Supreme Court has repeatedly held that a boundary line long acquiesced in and treated as the true line should not be disturbed on the basis of new surveys." *Id*. at 568. "Unlike adverse possession, a claim of acquiescence does not require that possession of the land was hostile or without permission." *Id*. at 568. The question of acquiescence only becomes important "when there has been some agreement, whether tacit or overt, as to the location of the boundary." *Id*. (cleaned up). "The underlying reason for the rule of acquiescence is the promotion of peaceful resolution of boundary disputes." *Id*. (cleaned up).

In this case, the Feigley Trust could not demonstrate that both parties had treated a particular boundary as the true boundary line for Area 1 or that both parties had treated the chain link fence as the true boundary line for Area 2. The Feigley Trust simply relied on Feigley's own self-serving testimony to attempt to establish a claim for acquiescence. The Feigley Trust did not produce any evidence or testimony from representatives of the Palmer Trust, any of its predecessors, or any neighbors to demonstrate that the Palmer Trust acquiesced to the Feigley Trust's encroachment across the disputed area or treated a particular boundary as the true boundary

---

[9] "The elements necessary to give rise to a prescriptive right are the same as those of title by adverse possession, with the exception that it does not have to be exclusive." *Marlette Auto Wash*, 501 Mich at 202 (cleaned up).

[10] The Feigley Trust did not plead a claim for acquiescence in its amended complaint. But, in its countermotion for summary disposition, it asserted that it should be permitted to amend its complaint to state a claim of acquiescence in the event that the court did not grant summary disposition in its favor on the adverse possession claim. The trial court did not specifically address the Feigley Trust's request to amend it complaint. The court simply concluded that "[t]he evidence submitted clearly shows that Plaintiff has failed to establish the necessary elements of hostility and/or adverse possession and/or acquiescence." Presumably, the court concluded that amendment would be futile.

-10-

line.  Accordingly, we conclude that the trial court did not err by holding that the Feigley Trust was unable to establish a claim for acquiescence.

Affirmed.


/s/ Mark J. Cavanagh
/s/ Michael J. Riordan
/s/ Sima G. Patel